**Evelyn MITCHELL, Plaintiff,**

v.

**JONES TRUCK LINES, INC.,
Defendant.**

**No. 85–2672 GA.**

United States District Court,
W.D. Tennessee, W.D.

Aug. 1, 1990.

Donald A. Donati, Memphis, Tenn., for plaintiff.

Thomas M. Franklin, Kansas City, Mo., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIBBONS, District Judge.

This sex discrimination case arises out of defendant Jones Truck Lines, Inc.'s denial of employment as an over the road truck driver to plaintiff Evelyn Mitchell. Plaintiff Mitchell seeks relief pursuant to 42 U.S.C. § 2000e *et seq.* on both disparate treatment and disparate impact theories.

### I. FINDINGS OF FACT

A. *The Denial of Employment.*
Around April 5, 1983, plaintiff went to the

Memphis terminal of Jones Truck Lines (Jones) to apply for a job as an over the road driver. She first spoke to a man who told her that the secretary who handled applications was out to lunch. At that time she did not know the identity of the man. Later, upon seeing the same individual at a deposition during the pendency of this case, she concluded that the man with whom she spoke was Jim Deare, line haul supervisor for Jones.

Later that day Mitchell returned to the Jones terminal and asked the secretary at the front desk for an application. The secretary told Mitchell that she did not handle applications and had never handled them. The secretary then left her desk for a few minutes and consulted with the man whom plaintiff later identified as Deare. She then returned and told Mitchell, "We don't have any applications." Plaintiff left the terminal and never filled out or submitted an application for employment.

Although defendant admitted in its answers to interrogatories prior to trial that plaintiff came to the Jones terminal seeking employment, at trial defendant spent some substantial amount of time trying to establish that plaintiff in fact never attempted to apply for employment with Jones. Defendant succeeded in showing that plaintiff may have been confused about the layout of the office and possibly about the identity of the individual with whom she spoke. The essential points of plaintiff's testimony, however, were not seriously challenged. Plaintiff's testimony was corroborated by her friend Judy Steele who accompanied her to make application for employment, although there was some inconsistent proof about whether Steele went inside with plaintiff or waited outside. In fact, plaintiff and Steele visited several truck lines around that same time, a factor that explains any errors about the office layout and personnel.

B. *Plaintiff's Qualifications as an Over the Road Driver.* Plaintiff's truck driving experience began in 1957 on her family-owned farm. For five months a year between 1957 and 1963, she drove a bob truck and tractor-trailer to haul materi-

als to a cotton gin. The distances for each trip were a maximum of 150 miles. This type of driving is similar to a peddle run under the Teamsters' national master freight agreement, which covers drivers at Jones.

In 1963 Mitchell and her husband purchased an additional tractor-trailer and drove cross-country hauling poultry and produce. The couple made approximately three round trips a month between Alabama and the West Coast. On each trip the distance driven was between five thousand and seven thousand miles a trip; plaintiff did approximately half the driving. The Mitchells drove the truck for nine months during the year. Plaintiff Mitchell drove between 12,000 and 15,000 miles a month, thus averaging between 108,000 and 135,000 miles per year. The Mitchells continued this activity for three years. Plaintiff was a safe driver and had no accidents.

After this experience in the 1960's, Mitchell performed other types of jobs. Between 1977 and 1981 or 1982 she was employed by the Illinois Central Gulf Railroad and drove train engines, forklifts and large tractors similar to farm tractors.

In 1983 plaintiff attended the American Career Training School, a certified truck driving school, to reacquaint herself with over the road driving. She did well in the school and was certified by the Department of Transportation under its regulations when she graduated in March of 1983. The four week course included thirty-two hours of classroom work and also substantial actual experience driving a tractor-trailer.

Defendant suggests that plaintiff was not physically capable of doing the work required of a road driver. Road drivers on occasion have to hook and unhook doubles, a task which Deare described as physically demanding. The more credible proof on this issue was offered by a female truck driver, Cathy Chandler, who described the process and said that the heavy dolly weighed quite a bit, but was counterbalanced. She stated, "you can lift it up with one hand. I guess a vacuum cleaner weighs about as much." Nothing suggests

that plaintiff was incapable of the amount of heavy lifting required by a road driver's job. She had done lifting of this nature in truck-driving employment subsequent to defendant's denial of employment to her.

C. *Defendant's Other Hires During the Relevant Time Period.* Defendant contends that it was not accepting applications or hiring at the time Mitchell came to the terminal for an application. Defendant also asserts that at that time it did not accept applications from individuals who simply walked in and asked for an application, but instead obtained its work force through referrals. Defendant suggests that, assuming plaintiff did come to its terminal to apply for a job, she was simply told that defendant was not hiring at that time, rather than that no applications were available. This contention is not supported by the evidence. The greater weight of the evidence is that defendant was hiring on April 5, 1983, and that plaintiff was simply told that applications were not available.

Deare first came to Memphis during the first two weeks of March 1983. Hiring road drivers was one of his responsibilities, and he came to Memphis knowing that additional road drivers would be hired in 1983. Deare's testimony was that he took applications during the remainder of March 1983 and then did not take any further applications until late April 1983. He says therefore that he was not accepting applications on April 5, 1983, at least not from walk-ins.

Defendant's records do not support Deare's testimony. The records available at the time of trial and admitted into evidence do not include all of the applications for driver positions submitted in 1983, but simply some of the applications of persons hired in driver positions. These records reveal that one individual filled out an application on April 5, 1983, the same day that plaintiff requested an application. Deare attempted to explain this application by saying that this particular applicant had contacted Jones earlier and thus was not really someone who sought employment on April 5. Deare also explained that this applicant presented a special situation because he was black, and Jones was looking for black drivers. Despite Deare's testimony, this application is strong evidence that Jones was taking applications and hiring at the time plaintiff attempted to apply. The records also reveal that three hirees submitted applications on April 26, 1983, and one hiree submitted an application on April 27, 1983. Just as damaging to Deare's testimony is the fact that at least two applications reveal that the applicants were not referred, but simply walked in and requested an application. All of the applications found in defendant's records were submitted by males.

Defendant's position about the status of its hiring efforts on April 5 is further undermined by the fact that the employee who initially spoke with job applicants gave testimony entirely inconsistent with that of Deare and defendant's own records. This employee, Eunice Carter, who was responsible for referring job applicants to Deare if applications were being taken, testified that she did not know of anyone referred to Deare between April and June 1983. Yet defendants' records show that a number of males applied and were hired during this three month time period.

Defendant employs two types of road drivers, casual and regular. A casual driver works for a period of less than thirty days, while a regular driver is a permanent employee. After March 1983 there were four to six casual drivers working at all times in Memphis. At least twelve casual drivers were hired at the Memphis terminal between April 1 and August 1, 1983. Six regular drivers were hired in 1983 after plaintiff attempted to apply. Another four men were hired as regular drivers in 1984.

Plaintiff concedes that most of the men hired by defendant as drivers in 1983 and 1984 had greater experience as road drivers than she did. Plaintiff, however, contends that Jones hired two drivers with qualifications similar to hers. Billy Grinder was hired as a regular road driver on May 27, 1983. Grinder had worked as a road driver for another company from June 30 to September 10, 1982. Prior to that time his last road driving experience was

from May 19, 1965, through January 14, 1969. Grinder was recommended to Deare for hire by Ivan Crook, Jones' senior vice president for operations.

Jones hired Billy Moffitt as a regular driver on July 18, 1983. At the time he was hired, Moffitt's last experience as a road driver was from December 1975 to January 1978. He also had ten additional years driving experience for Roadway Express from 1959 to 1969. The experience with Roadway included city driving and peddle runs.

D. *Evidence of Intentional Discrimination.* Defendant has never employed a woman driver at its Memphis terminal or any of its other terminals. In the geographic area of the Southern Conference of Teamsters, defendant employed 172 drivers on September 4, 1984, at terminals in Memphis, Little Rock, Oklahoma City, Dallas, Atlanta, and Jackson, Mississippi. Between February 2, 1981, and October 9, 1984, defendant hired ninety-eight regular road drivers in the Southern Conference, all male.

Statistical proof, obtained from the 1980 census, reveals the following percentages of female drivers in various categories in the cities in the Southern Conference in which defendant has terminals:

| | MALE | FEMALE | % FEMALE |
|---|---|---|---|
| **Memphis SMSA** | | | |
| Motor Vehicle Operators | 13,081 | 1,143 | 4.19 |
| Truck Drivers: | | | |
|    Heavy | 9,273 | 180 | 1.90 |
|    Light | 1,926 | 178 | 8.46 |
| **Dallas–Ft. Worth SMSA** | | | |
| Motor Vehicle Operators | 43,248 | 3,086 | 6.66 |
| Truck Drivers: | | | |
|    Heavy | 26,642 | 786 | 2.86 |
|    Light | 9,087 | 849 | 8.54 |
| **Houston SMSA** | | | |
| Motor Vehicle Operators | 39,879 | 4,997 | 11.14 |
| Truck Drivers: | | | |
|    Heavy | 25,463 | 851 | 3.23 |
|    Light | 7,949 | 1,052 | 11.69 |
| **Little Rock SMSA** | | | |
| Motor Vehicle Operators | 5,296 | 387 | 6.81 |
| Truck Drivers: | | | |
|    Heavy | 3,463 | 57 | 1.62 |
|    Light | 1,023 | 85 | 7.68 |

|  | MALE | FEMALE | % FEMALE |
|---|---|---|---|
| **Atlanta SMSA** | | | |
| Motor Vehicle Operators | 26,309 | 387 | 6.81 |
| Truck Drivers: | | | |
|     Heavy | 16,525 | 388 | 2.29 |
|     Light | 4,221 | 336 | 7.37 |
| **Jackson, MS. SMSA** | | | |
| Motor Vehicle Operators | 4,571 | 432 | 8.63 |
| Truck Drivers: | | | |
|     Heavy | 3,129 | 113 | 3.48 |
|     Light | 716 | 71 | 9.02 |

The average percentage of women employed as heavy truck drivers in these relevant SMSA's is 2.73%. There were a total of 86,870 heavy truck drivers in these areas; of these 2,375 were women.

For the United States as a whole and the Southern Conference states in which Jones has terminals, the 1980 census figures concerning number of female drivers and their percentages in the work force are:

|  | MALE | FEMALE | % FEMALE |
|---|---|---|---|
| **United States** | | | |
| Motor Vehicle Operators | 2,980,161 | 299,364 | 9.13 |
| Truck Drivers: | | | |
|     Heavy | 1,852,443 | 44,082 | 2.32 |
|     Light | 512,671 | 37,489 | 6.81 |
| **Tennessee** | | | |
| Motor Vehicle Operators | 66,376 | 5,055 | 7.07 |
| Truck Drivers: | | | |
|     Heavy | 46,884 | 992 | 2.07 |
|     Light | 8,592 | 547 | 5.98 |

|  | MALE | FEMALE | % FEMALE |
|---|---|---|---|
| **Texas** | | | |
| Motor Vehicle Operators | 202,712 | 16,943 | 7.71 |
| Truck Drivers: | | | |
| Heavy | 130,139 | 3,714 | 2.77 |
| Light | 39,314 | 3,807 | 8.83 |
| **Arkansas** | | | |
| Motor Vehicle Operators | 34,502 | 2,110 | 5.76 |
| Truck Drivers: | | | |
| Heavy | 24,464 | 532 | 2.13 |
| Light | 5,139 | 377 | 7.34 |
| **Georgia** | | | |
| Motor Vehicle Operators | 73,701 | 7,808 | 9.58 |
| Truck Drivers: | | | |
| Heavy | 49,537 | 1,157 | 2.28 |
| Light | 11,087 | 829 | 6.96 |
| **Mississippi** | | | |
| Motor Vehicle Operators | 35,244 | 3,861 | 9.87 |
| Truck Drivers: | | | |
| Heavy | 26,109 | 746 | 2.78 |
| Light | 4,221 | 251 | 5.61 |

In the states listed above, the average percentage of female drivers is 2.51%. There were a total of 284,274 drivers; of these 7,141 were female.

There is also direct evidence that the failure to employ women drivers was a result of a policy of intentional discrimination. Plaintiff presented the testimony of James Allen, a former Jones' employee and long time union job steward at Jones. Allen testified that he referred women to Jones four or five times a year to apply for jobs as drivers or dock hands. None of these women was hired by Jones.

Allen also testified about conversations with Jones' officials about hiring women. He said that Ivan Crook told him that Jones was not going to hire women. Crook denied making such a statement and testified that this case was the first time he had ever heard of a lady making application at Jones.

Allen also testified about conversations with Bill Freeman, assistant terminal manager at Memphis. Freeman told Allen on more than one occasion that Jones would not hire women. One of the times that Freeman made this statement was in re-

sponse to Allen's inquiry about the reason that two women, Kitten Parham and Judy Coopwood, were denied applications. Freeman did not deny making these statements. Parham testified and confirmed the incident. Freeman initially refused Parham's request to fill out an application for employment as a road driver or dock worker, saying that Jones was not hiring at that time. When she persisted and asked to fill one out for future reference, Freeman refused to allow her to do so, without explanation.

Allen also talked with Memphis terminal manager Tom Chapin about the Parham incident. Chapin said that, as long as he was terminal manager, there would be no women working on the dock or on the road. Chapin did not testify at trial.

Allen also recounted an incident involving two female dock workers. Teamsters Local 667 referred two women to work on the freight dock as extra employees. The terminal manager at that time, William Drake and the assistant terminal manager were quite upset by this development. Allen's testimony about this incident was corroborated by John Mitchell, plaintiff's husband, who was president of Local 667 at that time, and Don Fields, then business agent for Local 667. Jones' labor relations specialist complained to Mitchell about the incident. Drake himself confirmed that the incident occurred and did not deny that he was upset. He stated that he observed that the women could not pick up some items and that he told the union that they were not qualified to do the work. Jones has never employed a woman as a permanent dock employee.

Finally, Allen testified that Deare mentioned to him plaintiff's effort to apply for employment. According to Allen, Deare said that John Mitchell's wife had come by looking for a job and that Deare was not going to hire her because she is a woman.

Allen said that he usually spoke with Deare twenty or thirty times a day.

Defendant made a serious attempt to impeach Allen, and there is in fact a real question concerning Allen's bias against Jones. Allen was fired by Jones after an incident in which he misloaded freight and threw away freight bills. He conceded his ill feelings about Jones.[1] Also, Allen was the city job steward rather than the road job steward, and it seems extremely unlikely that he was in a position to speak with Deare as frequently as he claimed. Yet, despite these credibility questions, Allen's testimony cannot be entirely discounted. Parts of his testimony were corroborated by John Mitchell, Fields, Parham and defendants' own witness Drake. The court finds that Allen testified truthfully concerning incidents involving the female dock workers and the efforts by Parham and Coopwood to apply for jobs. With respect to the statements that Allen attributed to Deare and Crook, the court cannot find by a preponderance of the evidence that these statements were made. They were uncorroborated by other proof and denied by Crook and Deare. Allen's position with the company was not such that management employees such as Crook and Deare would have naturally made statements to him about such a subject.

The statistical evidence that Jones has never employed a woman as a road driver or dock worker, despite the availability of women for these jobs, combined with the credible direct proof of a discriminatory policy supports the existence of a policy of intentional discrimination. The court finds that Jones had such a policy.

E. *Defendant's Driving Experience Requirement.* Jones has a two year minimum driving experience requirement for road drivers. This requirement arose out of a race discrimination lawsuit in which Jones entered into a consent decree with the United States. The consent decree set

---

1. Allen also did not like plaintiff's husband, whose opponents he had supported in union elections. He said that he testified only because he was subpoenacd. Despite Allen's views about John Mitchell, his grudge against his former employer was certainly stronger than any ill feeling against Mitchell. At one point during his testimony Allen said that he thought Jones and the union had made up a false case against him. He did not however attribute this action on the part of the union to Mitchell.

the qualifications which Jones could require road drivers to meet. With respect to the two years required experience, all applicants may be required to meet the following qualifications:

1.a. Not less than one year's driving experience with kinds of equipment comparable to that to be operated in the road driver classification. A reasonable amount of the applicant's driving experience shall be under driving conditions comparable to those of the position for which he is applying ...

b. Graduation from an acceptable truck driving school and/or completion of a training program if one exists, shall be deemed the equivalent of one year of driving experience. A list of acceptable truck driving schools will be agreed upon by the parties to this Decree and filed with the Court no later than April 10, 1974.

Under the criteria of the consent decree Mitchell met the minimum experience requirements. She had driven tractor-trailers for three years cross-country and intermittently on short runs prior to that. The number of miles driven for those years approximated those of Jones' drivers. Although she had not driven doubles, which Jones' drivers operated, her equipment and the conditions of her driving were comparable to those of road drivers for Jones. She had also graduated from a truck driver school, although the proof indicated that no list of acceptable schools had ever been agreed to by the parties.

Defendant asserts that experience was the main qualification for a road driver. Deare testified that he looked primarily at road driving experience. Indeed, most of the men hired by defendant in 1983 and 1984 had extensive road driving experience.

Although the drivers hired in 1983 and 1984 had extensive road driving experience, defendant had earlier hired road drivers who did not have as much experience. Prior to 1981 many city drivers, hostlers and dock workers had transferred to road driver positions in accord with the provisions of the consent decree. These individuals generally had no road driving experience. Allen claimed that some of these individuals did not even know the basics of shifting gears, turning, and the like, and that he had to show them how to do these things. Allen's testimony on this point is improbable. Allen himself was not a driver and Jones never asked him to assist others in learning to drive. No testimony corroborated Allen on this issue. While it is unlikely that Allen taught any of these transferred employees to drive, it is certain that many of them had not previously driven on the road. Many of them had driven tractor-trailers in the city, however.

In asserting her disparate impact claim, plaintiff says that defendant's reliance on two years minimum experience as a qualification is a facially neutral policy with a disparate impact on women. Defendant argues that there is a direct relation between experience and driving safety, and that requiring experience is thus a justifiable business necessity. This basis for the requirement was supported by the testimony of Deare and Ivan Crook. Both men indicated that road driving is more hazardous to the public than city driving because of the higher speeds at which the trucks travel on the highway. They cited studies showing a correlation between experience and safety. Defendant offered two studies in support of its position. One of these studies includes statistics about age and accident occurrence while the other contains statistics relating age, experience and accident occurrence.

Plaintiff attacked defendant's position about the safety justification for the experience requirement in two ways. First, plaintiff presented evidence showing that defendant does not obtain a motor vehicle report for casual drivers and thus does not ascertain what the prior driving record of these individuals is. Defendant also allows regular drivers to begin work before the motor vehicle report and the required background check are obtained. Finally, defendant's transfer of city employees with little, if any, road experience to road driver positions indicates a lack of concern about a correlation between experience and safety.

Second, plaintiff offered the expert testimony of Dr. Martin Shapiro, a psychologist and professor at Emory University, to refute the contention that a two-year experience requirement is a predictor of safe driving. Shapiro stated that neither of the studies offered by defendant validated experience as a predictor of safe driving. One study contained no experience data at all, and the other reported only numbers of accidents, driver age and driver experience with the reporting carrier. It did not give accident rates or look at the total experience of drivers involved in accidents. Shapiro said that a study could be devised to study the relation between safety and experience.

Shapiro suggested that there were alternatives to a minimum experience requirement, such as co-driving systems under which new drivers are trained and evaluated by more experienced ones, driver training programs and driver education schools. Shapiro offered an opinion that there was not a relationship between experience and an ability to drive safely.

F. *Plaintiff's Employment After April 5, 1983.* Between June and August 1983 plaintiff was employed as an over the road driver by Osborn Transportation. She and her husband drove as a team, and plaintiff drove 1000 to 1400 miles per week on the average.

Mitchell next was employed as an over the road driver in March 1984 by W.E. Graham, Inc. She worked there for two years, carrying government mail between Memphis and Philadelphia in a team operation. She drove about 7000 miles a month.

Graham fired plaintiff for attempting to organize a union. Her NLRB charge resulted in a settlement in which she received $9000.00 in back pay.

Plaintiff next worked for Shenandoah Express as an over the road driver, beginning in February 1986. She transported furniture and televisions to California and nuts and bolts back to Memphis. At the time of trial plaintiff was still employed by Shenandoah, but had reduced her hours voluntarily to care for a grandchild in her custody.

Plaintiff had no difficulty driving in any of these positions. She has had no chargeable accidents in her driving career.

Plaintiff computed her back pay request based on the earnings of six people hired by Jones as regular drivers after April 5, 1983. The total back pay sought is $170,630.97.

## II. CONCLUSIONS OF LAW AND ANALYSIS OF THE EVIDENCE

The parties agree that the court has jurisdiction over this case.

A. *The Disparate Treatment Claim.* Plaintiff's disparate treatment claim challenges two employment decisions. The first was the real decision not to give plaintiff a job application and consider her for employment. The second decision is a hypothetical one; this is the decision not to hire plaintiff that defendant would have made had it considered plaintiff for employment. Because the evidence pertaining to these two decisions differs, separate discussion of each is necessary.

■ With respect to the decision not to consider plaintiff for employment, the analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. Plaintiff has shown that she was treated differently from similarly situated male applicants. Males, including walk-ins, were permitted to submit applications and were considered for employment. Thus plaintiff has established a *prima facie* case. Defendant has articulated a legitimate non-discriminatory reason for its action. It contends that it was not hiring or not hiring walk-ins at the time plaintiff sought to apply. Plaintiff has met her ultimate burden of establishing by a preponderance of the evidence that defendant's decision not to consider her for employment was motivated by intentional discrimination based on sex. Defendant had never employed a woman driver or dock worker in the area covered by the Southern Conference of Teamsters. Women other than plaintiff had been denied applications. Defendant's officials had made statements that Jones would not

hire women. Plaintiff was denied an application at a time when applications were being taken, strong evidence that defendant's offered reason for denying plaintiff an application is pretextual. The court finds that defendant denied plaintiff an application because of her gender.

■ Although plaintiff has established that the decision not to give her an application was motivated by intentional gender discrimination, this finding in and of itself would entitle plaintiff only to have her application considered. In order to determine whether plaintiff is entitled to a job or back pay, the court must make findings as to whether plaintiff would have obtained the job had her application been considered. In other words, the court must consider the hypothetical decision. The parties agree that if the hypothetical decision had been made, the decision would have been to deny plaintiff employment. Plaintiff asserts that this decision would have been motivated by sex discrimination; defendant asserts that it would have been motivated only by plaintiff's lack of experience.

In analyzing defendant's hypothetical decision to hire applicants other than plaintiff, the analysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), is appropriate. Because defendant did not hire women as road drivers, plaintiff has established that gender played a part in the employment decision. One of the reasons for defendant's action was that plaintiff was a woman. *See Hopkins*, 109 S.Ct. at 1789–90. The proof also establishes that plaintiff's lack of experience was another reason for defendant's failure to hire her. Under these circumstances, Jones may avoid liability by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken plaintiff's gender into account. 109 S.Ct. at 1787–88. Jones has met that burden.

Virtually all of the road drivers hired by Jones in 1983 and 1984 had substantially more road driving experience than plaintiff. Plaintiff focuses, however, on two road drivers, Billy Grinder and Billy Moffitt. Grinder and Moffitt both had less road driving experience than the other hirees, and their experience, like plaintiff's, occurred some years prior to their applications for employment with Jones.

The court disagrees with plaintiff's contention that her qualifications were equal to or greater than those of Billy Moffitt. While Moffitt had worked as a road driver for slightly over two years, compared with plaintiff's three years experience, his road driving experience occurred five years prior to his application with Jones. Plaintiff had not worked as a road driver for some seventeen years prior to her application with Jones. In addition, Moffitt had ten years driving experience for Roadway Express, doing city driving and peddle runs. His total driving experience was thus significantly greater than plaintiff's experience. While plaintiff had recently attended a truck driving school, Deare and other Jones officials did not know anything about the school or its credentials. Defendant has established that it would have hired Moffitt instead of plaintiff even if it had not taken plaintiff's gender into account.

Plaintiff correctly asserts that Grinder's qualifications were not superior to hers. Grinder had slightly more road driving experience than plaintiff did, but he did not have her other driving experience and had not attended a driving school. Grinder, however, was known personally by Ivan Crook, one of Jones' senior officials. Crook recommended to Deare, who was subordinate to him within the company, that he hire Grinder, whom Crook thought would be a good employee. Naturally, Deare followed the recommendation. While Grinder may have been hired on a basis other than the length of his experience, defendant has established that it would have hired Grinder anyway even if it had not taken gender into account, because of Crook's recommendation.

Plaintiff emphasizes the fact that in prior years Jones permitted city drivers with little if any road experience to transfer to road driver positions. These transfers did occur, but they stopped in 1981. By the time plaintiff sought employment with defendant, there was an excellent supply of

experienced road drivers. Jones was in fact hiring experienced people at that time. If plaintiff had been considered for employment, defendant would have hired these more experienced drivers, even if it had not considered plaintiff's sex.

Because plaintiff has failed to prevail on this aspect of her disparate treatment claim, she is not entitled to a job with defendant or back pay. Plaintiff was a victim of Jones' intentional gender discrimination in refusing to give her an application. Nevertheless, plaintiff is not a victim who is entitled to recovery. Under the *Hopkins* standard, recovery in Title VII disparate treatment cases is appropriately limited by causation requirements.

■ B. *The Disparate Impact Claim.* Much proof at trial related to plaintiff's disparate impact claim. Resolution of this claim turns on a simple point. Plaintiff's disparate impact claim challenges defendant's two-year minimum experience requirement and asserts that this facially neutral policy has a disproportionate impact on women. Whatever the merits of this position, this disparate impact claim is not one that plaintiff is entitled to assert. The court has found, as plaintiff argued, that she met the two-year experience requirement. Because plaintiff is not a person excluded by the requirement, she suffered no injury as a result of its use. *See Griffin v. Dugger*, 823 F.2d 1476, 1483–84 (11th Cir.1987), *cert. denied*, 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988); *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1258 (6th Cir.1981); *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895, 898–99 (5th Cir.), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978). Thus, plaintiff has no standing to claim that the two year experience requirement has a disparate impact on women. *Payne*, 565 F.2d at 898–99.

Plaintiff does not challenge defendant's use of experience as a qualification in general. Rather, she focuses only on the two-year minimum experience requirement. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law at 30 ("The practice being challenged by Mrs. Mitchell is

defendant's asserted requirement that applicants for road driver positions have a minimum of two years experience driving tractor-trailers.") In any event, defendant correctly notes that there is no evidence in this record to establish what impact the two-year experience requirement or any experience requirement has on women. While the proof gives information about numbers of women truck drivers, it says nothing about the experience or lack of experience of women truck drivers, women applicants or women as a group. The end result, which is that no women were hired, cannot substitute for proof concerning the impact of the challenged practice. *See Smith v. United Bhd. of Carpenters*, 685 F.2d 164, 168 (6th Cir.1982); *Costa v. Markey*, 706 F.2d 1, 5 (1st Cir.1982), *cert. dismissed*, 461 U.S. 920, 103 S.Ct. 2076, 77 L.Ed.2d 291, *cert. denied*, 464 U.S. 1017, 104 S.Ct. 547, 78 L.Ed.2d 722 (1983).

Plaintiff has failed to prevail on her disparate treatment and disparate impact theories. Accordingly, judgment shall be entered for defendant.

IT IS SO ORDERED.